1   David B. Mills, OSB #77281
    HAMMONS & MILLS
2   115 W. 8th Ave., Suite 280
    Eugene, Oregon 97401
3   Phone: (541) 484-1216
    Fax: (541) 484-5326
4
5   Of Attorneys for Pete Hansen & Sons
6
7
8               IN THE UNITED STATES BANKRUPTCY COURT
9                   FOR THE DISTRICT OF OREGON
10  In re                              )
                                       )    Case No. 06-62079-fra7
11  10 Bears at Chiloquin, Inc.        )
                                       )    HEARING MEMORANDUM
12                    Debtor.          )
                                       )
13  _____  )

14  **I. INTRODUCTION**

15  This Memorandum is divided into the following sections:

16  II. Summary of Bad Faith Conduct

17          A. Postpetition Bad Faith Conduct

18          B. Prepetition Bad Faith Conduct

19  III. Involvement of Pete Hansen & Sons Partnership

20  IV. *Marrama* and the Burden of Proof

21          A. §1112(b)(1)

22          B. §1112(b)(2)

23          C. Summary

24  V. Cause and Lack of Good Faith

25  VI. Postpetition Bad Faith Conduct

26          1.  Refusal to Disclose Source of Retainer

27

28

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon 97401
Phone: (541) 484-1216
Fax: (541) 484-5326

2. Refusal to Disclose Address

3. Failure to Disclose Claims against the Debtor

4. Stock in Ten Bears II, Inc.

5. Loans to Wayne Maynard and Stevens Kendall

6. Postpetition Loans to the Debtor

7. False Testimony by Mr. Maynard and Mr. Kendall

    A. Wayne Maynard

        1. Equishare and Sonny Ball

        2. Preparation of the Private Placement Memorandum

        3. Promises of stock in Ten Bears II, Inc.

    B. Stevens Kendall

VII. Prepetition Bad Faith Conduct

1. Fraudulent Transfer to Ten Bears II, Inc.

2. Fraudulent Private Placement Memorandum and Form SB-2

3. Fraudulent transfer to Rapids Properties, Inc.

4. Undisclosed Loans to the Shareholders of the Debtor

VIII. Conclusion

## II. SUMMARY OF BAD FAITH CONDUCT

The following presents an outline of the postpetition and prepetition bad faith conduct of

the debtor.  Details of each of these actions are provided further in this Memorandum.

### A. Postpetition Bad Faith Conduct

-On questioning by the Trustee, Mr. Maynard refused to disclose the source of the

retainer paid to Loren Scott to represent the debtor in these proceedings.  When advised

of the requirements of 11 U.S.C. § 329(a) which requires disclosure of the source of such

compensation, Mr. Maynard continued to refuse to disclose the source of that payment.

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

-On questioning at his deposition, Stevens Kendall refused to disclose his residence address.

-Financial records provided by the debtor to the Trustee disclosed numerous unpaid loans to the debtor which have not been disclosed in the debtor's schedules.  Those debts include a debt of at least $275,000 owed to elderly persons Herb and Lenore Person.

-Failure to disclose in Schedule B a claim against Kodiak Bears, Inc. arising from loans totaling more than $28,000. Kodiak Bears, Inc. was incorporated by Wayne Maynard who was its President, Secretary and registered agent. He owned stock in the company.

-Failure to disclose a claim against Ten Bears II, Inc for monies loaned to it for the preparation of the Private Placement Memorandum and Form SB-2.

-A Private Placement Memorandum prepared by Wayne Maynard and Stevens Kendall disclosed that the debtor owned 28 million shares of Ten Bears II, Inc. and that stock was not disclosed in the debtor's schedules.

-A scam perpetrated by the shareholders involving loans to them by the Corporation and the retroactive execution of employment contracts results in claims against the debtor by the IRS for unpaid Social Security taxes and unpaid withholding taxes.  No disclosure was made by the debtor in its schedules concerning the claim of the IRS. Stevens Kendall admitted in his deposition that he had not declared any of the wage compensation on his income tax returns.

-Depending on whether the testimony of Stevens Kendall before or after his deposition

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

testimony was interrupted by his attorney to confer with Mr. Kendall is believed, the

debtor may have sought and obtained a $50,000 line of credit postpetition.


-Both Mr. Maynard and Mr. Kendall gave false testimony during their depositions. Mr.

Maynard started his deposition by throwing the first exhibit across the table at counsel

and received the following admonition: "Mr. Maynard, throwing the exhibit across the

table at me isn't going to serve any purpose. Let's just put it right there so that the court

reporter will have it and we can refer to it again."


-Mr. Maynard and Mr. Kendall are using the property fraudulently transferred by the

debtor to Rapids Properties, Inc. to entice persons to "invest" in their "project". After

changing his testimony from the debtor postpetition obtaining money from Herb and

Lenore Person, Mr. Kendall testified that he and Mr. Maynard had talked the Persons into

putting up stock the Persons had in Centennial Bank as collateral for a $50,000 line of

credit for Rapids Properties, Inc.


### B. Prepetition Bad Faith Conduct


-Using approximately $300,000 borrowed from Pete Hansen & Sons Partnership [PH&S],

10 Bears at Chiloquin, Inc. [10 Bears or debtor] purchased the Rapids property from

Taylor and Lisa Day on May 17, 2004.  On May 18, 2004 Wayne Maynard and Stevens

Kendall purportedly on behalf of 10 Bears transferred the real property to Ten Bears II,

Inc. [Ten Bears II].

> -That transfer was made with no disclosure to PH&S to whom repeated
>
> representations in writing had been made that 10 Bears would upon acquisition of
>
> the property deed the property to PH&S.

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

-That transfer was made with no disclosure to PH&S who had a written agreement with 10 Bears that PH&S would be deeded the real property.

-That transfer was made without the consent of Taylor and Lisa Day as required by the sale contract they had with 10 Bears.

-That transfer of all of the assets of 10 Bears was made without notice to the Chairman of the Board of 10 Bears, without notice to shareholders, without a shareholders' resolution and without a resolution of the Board of Directors following statutory notice and without any notice of dissenter's rights required under ORS 60.551 et. seq.

-The circulation of a Private Placement Memorandum and the filing with the Securities and Exchange Commission of a Registration of Securities by a Small-Business Issuer (Form SB-2) on behalf of Ten Bears II contained material misrepresentations and omissions including but not limited to:

-The misrepresentation that the office building located at 325 A Street, Springfield, was owned by a company associated with Ten Bears II when it was not.

-The misrepresentation that stock in Ten Bears II had been issued when it had not.

-The misrepresentation that there were no circumstances known to Wayne Maynard, Stevens Kendall or Lori Allen which may give rise to any cause of action which may imperil Ten Bears II, when they knew that:

-The real property transferred to Ten Bears II was the subject of an agreement with Pete Hansen & Sons requiring the transfer of that property to Pete Hansen & Sons.

-There had been no corporate resolutions in compliance with Oregon statute, either by the board of directors or shareholders of 10 Bears at Chiloquin, Inc., authorizing the transfer of the real property to Ten Bears II.

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

1   -There were creditors of 10 Bears at Chiloquin, Inc. which would have a

2   fraudulent conveyance claim against Ten Bears II for the transfer of the

3   property from 10 Bears at Chiloquin, Inc.

4   -Stock had not been transferred to the entities and persons listed as having

5   received stock and those parties would have claims against Ten Bears II..

6   -Stock had been promised to others who were not disclosed and those

7   parties would have claims against Ten Bears II.

8   -Failure to disclose that Wayne Maynard had been convicted of bankruptcy fraud.

9   -Failure to disclose that the Fixed Base Operation for which Mr. Maynard had

10  been a CEO, had filed a chapter 11 while he was the CEO and the case was

11  converted to chapter 7.

12

13  -Fraudulent transfer of the real property from 10 Bears at Chiloquin, Inc. to Rapids

14  Properties, Inc.

15  -That transfer was actively concealed from Pete Hansen & Sons.

16  -That transfer was without the consent of Taylor and Lisa Day in breach of the

17  contract between them and 10 Bears at Chiloquin, Inc.

18  -That transfer was made in complete disregard of the earlier transfer of the

19  property to Ten Bears II and without any notice to the shareholders of Ten Bears

20  II.

21  -That transfer was made to a company which: (1). Had and continues to have no

22  shareholders; (2). Was and is controlled by the same persons who controlled the

23  debtor; (3). Which has obtained and continues to obtain money from persons who

24  are promised an "investment" in the company.

25

26  -Shareholders of the debtor borrowed more than one half million dollars of funds loaned

27

28

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

to the debtor by Pete Hansen & Sons for themselves.  These "loans" were taken on a weekly basis with numerous "bonuses" paid to them.  When they were confronted by the IRS, Wayne Maynard and Stevens Kendall entered into retroactive employment contracts with the debtor.  When Stevens Kendall was asked when he was going to pay back the loans, his testimony was that the obligations had been set off against the wages that were due him under the retroactive employment contracts.  Stevens Kendall admitted in his deposition that he had not declared any of the wage compensation on his income tax returns.

## III.  INVOLVEMENT OF PETE HANSEN & SONS PARTNERSHIP

Tom Staggs, Wayne Maynard and Stevens Kendall joined together in or about 1999 to obtain certain real property in Chiloquin, Oregon consisting of approximately 80 acres [Rapids property].[1]

Tom Staggs discussed with Don Hansen the real property and the possibility of the partnership Don Hansen had with his brother, Ron Hansen, i.e. Pete Hansen & Sons Partnership [PH&S] becoming involved with the property. Don Hansen and Ron Hansen were ranchers whose partnership owned considerable timbered acreage that had been in the family for generations.

The first scheme presented to PH&S involved a company named Equishare Financial, Inc., [Equishare] owned by Sonny Ball. The scheme called for PH&S to borrow $1 million dollars using its timber as collateral. The money would be used to purchase the

---

[1]They had an agreement to purchase 34 acres and an option to purchase adjacent 46 acres from Taylor and Lisa Day..

**Page 7 of 36**    HEARING MEMORANDUM

1 Rapids property which would be transferred to Equishare. Equishare would then issue a

2 Letter of Credit in the amount of $1 million to guarantee that the loan obtained by PH&S

3 could be repaid.

4

5 One of the few smart things done by PH&S at the outset of this matter was contacting

6 Larry Thorp, an attorney in Eugene to review this proposal. Mr. Thorp was quick to point

7 out that a Letter of Credit is generally issued by a financial institution rather than a

8 company such as Equishare. With the exposure of the vacuous nature of the Letter of

9 Credit, the proposal disappeared and a new scheme to get money from PH&S was

10 formulated. As an aside and contrary to Mr. Maynard's recollection at his deposition,

11 Equishare and Sonny Ball would resurface later.

12

13 In October, 1999 10 Bears at Chiloquin, Inc. was created. The Minutes of the First

14 Annual Meeting specifically recited:

15

16      "RESOLVED ... the President [Wayne Maynard] and Chairman of the Board [Tom

17      Staggs] are hereby directed to continue to work out the terms of an acceptable

18      agreement with the Hansens, part of which agreement will contain the provision

19      that **the acreage purchased in Klamath County from the proceeds** of the $1

20      million loan **will be deeded to the Hansens** to secure the use of their timber

21      assets, said deeds attached to irrevocable options for the corporation to repurchase

22      said land.  It is the intent of this resolution to clarify that the re-purchase of the

23      land will be the means to repay the $1 million loan, the repayment of which will

24      release the Hansen's timber asset." [emphasis added]

25

26 With repeated assurances that they would be deeded the Rapids property once it was

27

28

**Page 8 of 36**     HEARING MEMORANDUM

obtained from Taylor and Lisa Day, PH&S started loaning money to 10 Bears at

Chiloquin, Inc. using their timber as collateral:

 2000   $450,000

 2001   $220,000

 2002   $500,000

All the while, Wayne Maynard was representing that PH&S would be deeded the

property:

December 23, 2000 letter signed by Wayne Maynard:

> "As a matter of disclosure, I think we should let Don know that we fully
> described to Doyle Ehl (long before we talked to Jim Case) that **the**
> **Chiloquin property being purchased would <u>belong to the Family</u>**
> **<u>Hansen</u>, free and clear; it would be their security for pledging their**
> **timber**.  This security is very important to Don and to 10 Bears; it reaches
> from Don Hansen to his brother and to their sons--their family estate!"
> [emphasis added]

June 11, 2001 letter signed by Wayne Maynard and Tom Staggs on 10 Bears at

Chiloquin, Inc. stationary:

> "**The land purchased in Chiloquin will be deeded free and clear to the**
> **Family Hansen to secure their pledge for the funds**.  If a default should
> occur, the Family Hansen has the right to sell the Chiloquin land, or any

**Page 9 of 36**    HEARING MEMORANDUM

portion of said land, to protect their ranch and timber." [emphasis added]

October 23, 2002 memo from Wayne Maynard to Tom Staggs:

"Of course, if the land is purchased **it will be deeded to Pete Hansen & Sons Partnership**, and we all be [sic] encouraged to move on into the development." [emphasis added]

In November, 2002 these representations were memorialized as part of an "Agreement" entered into on November 20, 2002 between PH&S and 10 Bears at Chiloquin, Inc. which provided in part:

"When the Rapids property transaction closes, **the property will be conveyed to Hansens by a deed and Hansen will hold the fee simple title to the Property (whether 34 acres or 80 acres, as the case may be)**." [emphasis added]

By this time, 10 Bears at Chiloquin, Inc. was in litigation with Taylor and Lisa Day over the sale of the Rapids property. Money from PH&S was being used to finance that litigation.

Another $180,000 was borrowed by 10 Bears at Chiloquin, Inc. in 2003. A settlement was reached between the Days and the debtor which allowed for the purchase of the entire 80 acres with a down payment of $300,000. The agreement provided for the assumption of the trust deed on the property and the granting to the Days of a second trust deed. The agreement provided further that there would be no transfer of the property without the consent of the Days.

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon 97401
Phone: (541) 484-1216
Fax: (541) 484-5326

The debtor served an urgent request on PH&S for the funds needed to close the sale.  On May 13, 2004 PH&S loaned $375,000 to the debtor.

The sale of the Rapids property to the debtor was closed on May 17, 2004. A day later, Wayne Maynard and Stevens Kendall, purportedly for 10 Bears at Chiloquin, Inc., transferred the Rapids property to a corporation they had surreptitiously created, Ten Bears II, Inc. That transfer was not disclosed to PH&S nor was the partnership aware of it.

Thereafter, the debtor continued to assure PH&S that it was in the process of developing the property. In the meantime, the debtor was obtaining loans from third parties promising them stock in Ten Bears II, Inc.

When the debtor stopped making the payments on the loans which had been obtained using the PH&S timber as collateral, PH&S was confronted with foreclosures on its timber. They then sought refinancing of those loans. They also sought from the debtor a promissory note covering all of the earlier promissory notes given it by the debtor.  That culminated in the October 20, 2005 promissory note in the amount of $2,065,116.81. The first payment was due January 31, 2006. When it was not made, PH&S made demand and in June, 2006 sued the debtor.

Unbeknownst to PH&S, the debtor, while it was in discussions with the debtor for the execution of the promissory note, was seeking consent from the Days to transfer the Rapids property to a "clean corporation" without any debts, i.e. Rapids Properties, Inc. Despite the fact that the Days did not consent, the debtor executed a deed transferring the property to Rapids Properties, Inc. and recorded the deed January 10, 2006. The debtor

**Page 11 of 36**    HEARING MEMORANDUM

received an unsecured promise of Rapids Properties, Inc. to pay it for the property.

### IV. *Marrama* and the Burden of Proof

*Marrama v. Citizens Bank of Massachusetts, et al.,* 549 US _____, (2007) held that there was not an absolute right under 11 U.S.C. § 706(a) to convert a Chapter 7 case to chapter 13. That statute also addresses conversion of Chapter 7 cases to chapter 11 cases. Therefore, it appears that the Supreme Court's analysis is applicable to requests for conversion from chapter 7 to chapter 11.

The Supreme Court's opinion focused on §706(d) which provides that conversion to a case under another chapter is not available unless the debtor may be a debtor under that chapter. It then looked at whether there would be grounds for conversion of the case to Chapter 7 or dismissal in determining whether the debtor actually qualified to be a debtor in the reorganization chapter.

Applying the analysis set forth in the case of *Marrama* to a motion to convert a chapter 7 case to chapter 11, invokes 11 U.S.C. § 1112. The text of that statute is attached hereto for the convenience of the reader.

### A. §1112(b)(1)

11 U.S.C. § 1112(b)(1) provides that the court shall dismiss or convert a case to Chapter 7 if the movant establishes cause unless there are unusual circumstances specifically identified by the court that establishes the requested conversion is not in the best interests of creditors and the estate.

**Page 12 of 36**    HEARING MEMORANDUM

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon 97401
Phone: (541) 484-1216
Fax: (541) 484-5326

It appears from that language that a party objecting to the conversion of a case from chapter 7 to chapter 11 has the burden of establishing cause.  Further, a party seeking conversion would have the burden of establishing the referenced "unusual circumstances" if cause were established by the objecting party.

**B. §1112(b)(2)**

11 U.S.C. § 1112(b)(2) provides that the dismissal or conversion provided in paragraph (1) shall not be granted, absent unusual circumstances specifically identified by the court that establishes that such relief is not in the best interests of creditors and the estate, if the party resisting dismissal or conversion to chapter 7 establishes that (A) there is a reasonable likelihood that a plan will be confirmed; and (B) to the extent that the grounds for conversion of the case to Chapter 7 consist of something other than substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, there is reasonable justification for the act or admission complained of and that it will be cured within a reasonable period of time fixed by the court.

In the context of the *Marrama* analysis and a motion to convert a Chapter 7 case to chapter 11, it appears that a party seeking conversion to Chapter 11 would have the burden under subsection (2) of establishing that there is a reasonable likelihood that a plan will be confirmed (within the time frame set forth in the subsection) and that with regard to any cause raised by the objecting party other than that described under subparagraph (4)(A) there exists a reasonable justification for the act or omission and that it can be cured within a reasonable period of time fixed by the court. If a party seeking conversion to chapter 11 is able to establish those matters, the burden would be upon the objecting party to establish unusual circumstances specifically identified by the court that

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

established that such relief is not in the best interests of creditors and the estate.

### C. Summary

In summary, the parties objecting to this conversion have the burden of proof of

establishing the cause which would justify the conversion of the case to Chapter 7 or its

dismissal.  The debtor has the burden of establishing either unusual circumstances that

establish that keeping the case in Chapter 7 would not be in the best interests of creditors

and the estate or that there is a reasonable likelihood that a plan can be confirmed and that

the debtor can cure the acts or omissions that constitute the cause to retain the case in

Chapter 7.  If the debtor is able to meet that burden, the burden would be on the objecting

parties to establish unusual circumstances that establish that conversion is not in the best

interest of creditors and the estate.

## V.  CAUSE AND LACK OF GOOD FAITH

The matters constituting cause set forth in 11 U.S.C. § 1112(a)(4) are not exclusive.  *In re*

*Consolidated Pioneer Mortgage Entities*, 248 BR 368, 375 (9th Cir. BAP, 2000). The

grounds for appointment of a trustee under 11 U.S.C. § 1104 can constitute cause under

11 U.S.C. § 1112. *In re Jayo*, 2006 WL 2433451, pages 6-8 (Bkrtcy.D.Idaho 2006).

In *In re St. Paul Self Storage Limited Partnership*, 185 BR 580, 582 (9th Cir. BAP, 1995)

the 9Th Circuit Bankruptcy Appellate Panel stated:

> "Section 1112(b) allows the court to dismiss a bankruptcy case for cause and to
>
> find cause with a nonexclusive list of examples which warrant dismissal of a

**Page 14 of 36**    HEARING MEMORANDUM

1  petition.  11 U.S.C. § 1112(b).  Although section 1112(b) does not expressly

2  require that a petition be filed in good faith, the lack of good faith in filing a

3  chapter 11 petition constitutes cause for dismissal.  *In re Marsch*, 36 F.3d at 828;

4  *State of Idaho, Department of lands v. Arnold (In re Arnold)*, 806 F.2d 937, 939

5  (9th Cir. 1986).”

6

7  The Bankruptcy Appellate Panel noted that courts weigh a variety of circumstantial

8  factors in determining whether a petition has been filed in bad faith and that when those

9  factors “indicate that a debtor is unreasonably deterring or harassing creditors rather than

10  attempting a speedy and feasible reorganization, the court may conclude that the petition

11  has been filed in bad faith and dismiss it.”  At 583.

12

13  **VI.  POSTPETITION BAD FAITH CONDUCT**

14

15  **1. Refusal to disclose to the Trustee the source of a retainer paid to Loren**

16  **Scott to represent the debtor**

17

18  At the deposition of Wayne Maynard conducted on May 7, 2007 Loren Scott appeared

19  and represented that his firm had been retained to represent the debtor. During the

20  deposition of Wayne Maynard the Trustee asked the following questions and received the

21  following responses:

22

23  Q. Now, was a retainer paid to Mr. Muhlheim’s firm for their representation of the

24  debtor today?

25  MR. CARUSONE: I’m going to object to the question based on the attorney/client

26  privilege.  I don’t think you have a right to inquire about that.

27

28

**Page 15 of 36**    HEARING MEMORANDUM

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

1

2      MR. HUNTSBERGER: I'll ask another question.

3      Q. Who paid the retainer to the Muhlheim firm to represent the debtor here today?

4      MR. CARUSONE: I am going to object on the same basis and instruct my client

5      not to answer.

6

7      Mr. Carusone's attention was directed to 11 U.S.C. § 329 yet that information still has not

8      been provided to the Trustee.

9

10     **2.  On questioning at his deposition, Stevens Kendall refused to disclose his**

11     **residence address.**

12

13     Mr. Kendall was listed in the debtor's Statement of Financial Affairs as both a director

14     and an officer (Secretary/treasurer).  At some point, Mr. Kendall was terminated as a

15     director.  He does not know when that occurred.

16

17     Mr. Kendall signed the sale agreement transferring the Rapids property from the debtor to

18     Rapids Properties, Inc. as Secretary/Treasurer of 10 Bears at Chiloquin, Inc. and as

19     Secretary/Treasurer of Rapids Properties, Inc. At some point Mr. Kendall was terminated

20     as a director of Rapids Properties, Inc. He does not know when that occurred.

21

22     Depending on which version of Mr. Kendall's testimony is to be believed, Rapids

23     Properties, Inc., which has been and is a defendant in state and federal fraudulent

24     conveyance lawsuits, is soliciting funds from individuals to invest in Rapids Properties,

25     Inc.

26

27

28

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

1    It is hardly remote speculation that creditors and interested parties in this bankruptcy

2    proceeding might want to serve Mr. Kendall. His dwelling house or usual place of abode

3    is a place where that service can take place. BR 7004(b)(1). Mr. Kendall claims that his

4    sole source of income is Social Security. Therefore, no creditor can have any comfort that

5    the address that he gave the DMV in March, 2007 as his address constitutes the place

6    where he regularly conducts a business of profession.[2]

7

8    Moreover, Mr. Kendall has failed to comply with the Oregon statutes requiring that he

9    provide the DMV with **his residence** address. ORS 807.110.

10

11        **3. Failure to disclose claims against the debtor**

12

13    A check register provided to the Trustee by the debtor for the period at January 1, 2005

14    through October 6, 2006 disclosed several deposits to the debtor's checking account with

15    the designation "loan".  Those loans include deposits of funds from Herb and Lenore

16    Person totaling $200,000.  Mr. Maynard testified that an additional $75,000 had been

17    borrowed.  There were also deposits designated "loan" from Fred Stickley and Erika and

18    Steve Bosley. Those debts remain outstanding.

19

20    There were also loans from Mr. Maynard's ex-wife, Virginia Maynard and Mr. Maynard

21    admitted that a $9,000 loan was still outstanding.

22

23    There is no listing of these individuals in the debtor's schedules.

24    _____

25        [2]The address that Mr. Kendall had with the DMV until March 15, 2007 was 30 W. 17th,
      Eugene, the address he had used for his real estate broker business. He admitted that he had not
26    used that address for about a year. Mr. Kendall was in violation of ORS 807.560 for his failure to
      provide the DMV with notice of his change of address.

27

28
                                                              **Hammons & Mills**
                                                              115 W. 8th Ave., #280
                                                              Eugene, Oregon  97401
                                                              Phone: (541) 484-1216
                                                              Fax: (541) 484-5326

**4. Stock in Ten Bears II, Inc.**

Wayne Maynard and Stevens Kendall prepared a Private Placement Memorandum to solicit purchasers of stock in Ten Bears II, Inc. They also prepared and caused to be filed with the Securities Exchange Commission a Form SB-2.

The Private Placement Memorandum attached a Corporate Resolution from the board of directors of Ten Bears II, Inc. signed by Wayne W. Maynard, Stevens N. Kendall and Lori M. Allen as directors.  That Resolution recited both:

> "With particular care and prudence, the directors have carefully read and studied said PPM, including all exhibits, prepared with the assistance of the corporation's securities counsel, Alan W. Curtis, J.D."

And

> "The directors agreed that, to the best of their knowledge and belief, the document contained no untrue statement of a material fact nor omitted to state a material fact that would be necessary in order to make the statements contained therein not misleading in light of the circumstances under which they were made ...".

The Private Placement Memorandum contained the following statement:

> "**12.01(a) <u>Founders</u>** An organizational meeting of incorporators was held on April 14, 2004.  Founder's shares were issued for a consideration of one tenth of a mil ($0.0001) per share to the following founders:

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

10 Bears at Chiloquin, Inc.  28,000,000 common shares

Equishare Financial, Inc.           1,500,000 common shares

D&M Camelot, LLC                 800,000 common shares

S&S Diversified, LLC              800,000 common shares

Alan Curtis                      800,000 common shares

Dave Gilbert                     400,000 common shares

...

**12.02 <u>Only Issuance to Date</u>** This is the only issuance of shares that has taken place since the incorporation of Ten Bears II, Inc. on December 29, 2003. Currently, there are a total of six shareholders.  The total number of common shares outstanding is 32,000,000.  There have been no preferred shares issued as of the effective date hereof

No disclosure was made in Schedule B of the debtor's schedules of an interest in Ten Bears II, Inc.[3]

### 5. Loans to Wayne Maynard and Stevens Kendall

Wayne Maynard, Stevens Kendall and Tom Staggs commenced receiving weekly loans from the debtor in various amounts in the year 2000.  In addition to those amounts they would receive payments designated "bonuses".  The total amount of the loans to officers

---

[3] It should be noted that the listed shares total 32,300,000 shares rather than the 32,000,000 described in the text of the Private Placement Memorandum.

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

1  and shareholders was over $500,000.

2

3  In August, 2005 the debtor was warned by the IRS that it could not continue to loan funds

4  to insiders and stockholders for later repayment.

5

6  Nevertheless, the debtor continued to make those loans.

7

8  On August 28, 2005 the debtor entered into separate employment contracts with Stevens

9  Kendall and Wayne Maynard which were made retroactive to January 2, 2003.

10

11  Stevens Kendall was asked at his deposition when he was planning on paying to the

12  debtor the more than $130,000 he had borrowed, he responded that it had been set off

13  against the salary due him under the employment contract.  He admitted that he had not

14  declared any of the wage compensation on his income tax returns.

15

16  No disclosure was made in the debtor's schedules regarding claims that the IRS may have

17  for unpaid FUTA taxes and failure to withhold FICA and taxes. Employers required to

18  withhold tax are liable for paying this tax, whether or not it is collected from the

19  employee, unless the employee files a return and pays the underwithheld tax. IRC Sec.

20  3403; Reg. Sec 31.3403-1. An employee's payment of underwithheld taxes does not

21  necessarily relieve an employer of any penalties or additions to tax for failure to withhold

22  or pay over tax. IRC Sec. 3402(d); Reg. Sec. 31.3402(d)-1.

23

24  Persons responsible for withholding and paying over a tax (whether or not officers of the

25  corporation) may be held personally liable if they willfully failed to pay the tax.

26  Discharges in personal bankruptcy will not shield them from liability for the tax.  For

27

28

**Page 20 of 36**    HEARING MEMORANDUM

these purposes, a responsible person includes an officer or employee of a corporation.

At all times material herein, Wayne Maynard, Stevens Kendall and Lori Allen were within the scope of the definition of a responsible person.

No disclosure was made by the debtor concerning potential claims against its officers arising from their willful failure to pay the taxes.

### 6. Post-Petition loans to the debtor

During his deposition on May 10, 2007 Stevens Kendall testified that postpetition the debtor had obtained a loan from two elderly persons, Herb and Lenore Person by having them use the Person's stock in Centennial Bank as collateral for a $50,000 line of credit for the debtor.  The questioning was halted by Mr. Kendall's attorney, Jud Carusone, who escorted his client out of the room for a conference.

Upon his return, Mr. Kendall stated that he wished to change his testimony to reflect that the line of credit was actually obtained for the benefit of Rapids Properties, Inc.

Mr. Kendall testified that he did not know the extent to which the line of credit had been utilized.  Of course, the Trustee cannot tell whether any of those funds were used to pay the retainer for the Muhlheim firm to represent the debtor as the debtor has refused to disclose the source of that retainer.

### 7. False testimony by Mr. Maynard and Mr. Kendall

**Page 21 of 36**    HEARING MEMORANDUM

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon 97401
Phone: (541) 484-1216
Fax: (541) 484-5326

The following is not intended as an exhaustive list of the deceptions by Mr. Maynard and Mr. Kendall during their depositions. It is only intended to highlight some of them.

A. Wayne Maynard

1. Equishare and Sonny Ball

Recall that Equishare and Sonny Ball first appeared at the very beginning of the involvement of PH&S as part of the scheme to have PH&S borrow $1 million which would be used to purchase the Rapids property which would then be transferred to Equishare who would issue a Letter of Credit to assure PH&S that its loan would be repaid.

Equishare and Sonny Ball show up again in 2004 after the debtor has transferred the Rapids property to Ten Bears II, Inc. as a founding shareholder of Ten Bears II, Inc. as disclosed in the Private Placement Memorandum and the Form SB-2.

Contrary to the Private Placement Memorandum and the Form SB-2, the debtor's corporate minute book reflects that the debtor, Mr. Maynard, Mr. Kendall and Lori Allen had refused to issue the stock to Equishare. In the words of Mr. Maynard on April 15, 2006:

> "As of this date, we have nothing else working.  If we're going to move forward
> with the Equishare plan, will have to decide and make some commitments fairly
> soon.  But the fact is, we both have reservations and for good reasons.  Have we
> been kicked around and now considering going back for seconds?  What's the

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

1    most money 'they' have from us to date? $25,000.

2

3    Surely if there was a plot, the stakes were higher in their minds than $25,000-that

4    is Sonny and Curtis [Sonny Ball and Alan Curtis].  Was the plot to get positioned

5    through corporate legerdemain to actually take over the company, therefore the

6    land?  **Were they pissed because we discovered the possibility and backed off?**

7    **Did our refusal to issue shares generate more havoc than we thought at the**

8    **time?**  Did both Sonny and Curtis have a money-home for the 2 million shares

9    they thought they'd have under their control (actually 4 million counting Sutley's

10   stock)?... **it's possible we inadvertently threw a monkey wrench in the works**

11   **by our refusal to issue stock.**" [emphasis added]

12

13   Despite all of this involvement with Equishare and Sonny Ball, Mr. Maynard testified as

14   follows on May 7, 2006:

15

16   Q. What involvement has Equishare Financial, Inc., had with 10 Bears at

17   Chiloquin, Inc.?

18   A. None.

19   Q. What involvement has Equishare Financial, Inc., had with Ten Bears II, Inc.?

20   A. No direct involvement.

21   Q. What indirect involvement?

22   A. Mr. Ball Wright commended to the officers and directors of 10 Bears at

23   Chiloquin the name of a lawyer in Newport Beach who was purported to be an

24   expert in securities law.

25   Q. Would that be Alan Curtis?

26   A. Yes.

27

28

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

1    **Q. Was there any other indirect involvement that Equishare Financial, Inc.,**

2    **had with Ten Bears II, Inc.?**

3    **A. Not that I recall today.** [emphasis added]

4

5    2. Preparation of the Private Placement Memorandum

6

7    During his deposition Mr. Maynard testified that he only scanned the Private Placement

8    Memorandum and Form SB-2 and had limited involvement in inputting information for

9    them.

10

11    Both the corporate resolution of Ten Bears II, Inc. and the minutes of the Special Meeting

12    of Directors of 10 Bears at Chiloquin, Inc., June 5, 2005 tell a different story.

13

14    The corporate resolution, signed by Mr. Maynard, recites that he had carefully read and

15    studied the Private Placement Memorandum.

16

17    The minutes recite that:

18

19    "The Board took note that since the date of incorporating [Ten Bears II, Inc.] a

20    significant amount of work has been accomplished by [10 Bears at Chiloquin, Inc.]

21    toward the completion of the Registration Statement, as follows:

22

23    -Consulting with an attorney doing business in California (hereinafter,

24    "AC")

25    -Executing a fee agreement with AC.  Paying a retainer of $25,000 to AC.

26    -Spending dozens of hours preparing required documentation to comply

27

28

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

1    with SB-2 rules.

2    -First acquiring a Private Placement Memorandum.

3    -Filing two Registration Statements.

4    -Many hours of consultation with AC

5    -Spending the time and money to establish a Stock Transfer Company in

6    Nevada.

7    -Spending the time and money to establish a genuine business presence in

8    Nevada.

9    -Spending the time and money to complete a formal audit of corporate

10    (Nevada) books & records.

11

12    [10 Bears at Chiloquin, Inc.], in the authorized position of financing the process of

13    filing the Registration Statement, **contributed hundreds of man-hours and**

14    **loaned thousands of dollars to [Ten Bears II, Inc.]** comprehending that, when

15    appropriate and practicable, [Ten Bears II, Inc.] would repay [10 Bears at

16    Chiloquin, Inc.].  How the loaned funds were utilized is set forth in the regular

17    accounting records of 10 Bears at Chiloquin, Inc." [emphasis added]

18

19    3. <u>Promises of Stock in Ten Bears II, Inc.</u>

20

21    Contrary to the statements in the private placement memoranda and Form SB-2 that stock

22    in Ten Bears II, Inc. had been issued, Mr. Maynard testified that no stock had in fact been

23    issued. He was then asked the following question and gave the following answer:

24

25    "Q. And you never made any promises to people about stock in Ten Bears II, Inc.

26    is that correct?

27

28

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

...

A. It is correct.  Sonny Ball may have.  Sutley may have.  Wayne Maynard or any

member of our corporation, no."

The Form SB-2 was registered with the SEC on October 13, 2004. Prior to that

registration, a promissory note dated August 4, 2004 signed by Wayne Maynard for the

debtor in the amount of $25,000 in favor of Lance Williamson provided:

> "Further, in addition to the payment of principal and interest dated herein, the
>
> undersigned promises to deliver to the holder of this note, when issued, 150,000
>
> shares of R-144 common stock of the Ten Bears II, Inc. a Nevada Corporation,
>
> which stock shall be issued to the holder here of or any party named by said
>
> holder."

On September 16, 2004 Wayne Maynard and Stevens Kendall executed on behalf of the

debtor a promissory note in the amount of $25,000 in favor of Elaine Hopson which

provided her with an option to convert the note to common stock of Ten Bears II, Inc. at

$.25 per share (100,000 shares).

B. Stevens Kendall

Mr. Kendall was content with answering most questions with the response that he did not

recall, until he was confronted with documents showing his signature.

He repeatedly stated that PH&S had not been promised the Rapids property. When he

was shown the 2002 agreement between the debtor and PH&S providing that the

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

1 partnership would be deeded the Rapids property, he responded that was something that

2 Wayne Maynard and Tom Staggs had done and that he was not involved.

3

4 He was then asked and gave the following answer:

5

6 "Q. So is it your testimony you never had an understanding that they were to

7 receive any of the property by deed?

8 A. Not that I recall. That's correct."

9

10 Later, he had difficulty arising from his signature appearing on the minutes of the first

11 annual meeting of the Board of Directors for the debtor below the statement that read:

12

13 "The president and chairman of the board are hereby directed to continue to work

14 out the terms and conditions of an acceptable agreement with the Hansons, part of

15 which agreement will contain the provision that the acreage purchased in Klamath

16 County from the proceeds of the $1 million loan will be deeded to the Hansons to

17 secure the use of their timber assets."

18

19 Certainly, the biggest problem that Mr. Kendall encountered concerned his testimony

20 about his conversation **after the filing of the bankruptcy** with Lenore Person:

21

22 "Q. And you told her that 10 Bears at Chiloquin needed some money?

23 A. Yes.

24 Q. And did she give you any?

25 A. Yes.

26 Q. How much?

27

28

**Page 27 of 36**    HEARING MEMORANDUM

1    A. She agreed to put up some stock that she and Herb had, I believe, in Centennial

2    Bank with the Sterling Bank-for a loan from the Sterling Bank.

3    ...

4    Q. Did she put up that stock?

5    A. Yes.

6    Q. And how much was borrowed?

7    A. $50,000.

8    Q. Where did the $50,000 go?

9    A. Go?

10   Q. Yes.

11   A. For general operations and legal fees.

12   Q. When you got the -

13   MR. CARUSONE: let's take a little break.

14   MR. MILLS: okay.  Let the record reflect that Mr. Carusone is taking a break at

15   the point where we're inquiring about a postpetition loan.

16   (A recess was taken.)

17   BY MR. MILLS:

18   Q. Mr. Kendall, you've had an opportunity to talk with Mr. Carusone are there any

19   answers you like to change.

20   A. Yes.

21   Q. Okay. Go ahead.

22   A. All the-I made a mistake.  All the funds from the Persons were directed to RPI,

23   Rapids Properties, and not to 10 Bears at Chiloquin.  That was a mistake on my

24   part.

25   Q. That would be the most recent loan.  Right?

26   A. Yes.  And the original two hundred was also to-I believe to RPI.

27

28

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

1  MR. CARUSONE: I'm not sure about that.

2  MR. HUNTSBERGER: let him answer.

3  MR. MILLS: let him answer.

4  A. Well, it was-the purpose was to purchase stock in RPI at the time that it was

5  property-proper and legal to do so.

6  BY MR. MILLS:

7  Q. Let me show you where the hundred thousand dollars goes into the account,

8  Mr. Kendall, and I'll ask you if the checks after that date aren't $1620 Lori Allen,

9  $400 to you, $600 to Wayne Maynard, $5,000 for Rapids' tax account, $20,000 to

10  Lance Williamson, $11,000 to Pacific Continental Bank.

11  A. They are.

12  Q. The money to Lance Williamson, how did that get to the Rapids Properties?

13  A. But not sure.

14  Q. You were pretty much just guessing about what that $200,000 was used for,

15  weren't you?

16  A. Yes."

17

18  The reader can draw his own conclusions concerning whether the testimony before the

19  recess was accurate or whether the testimony after the recess was accurate.

20

21  **VII.  PREPETITION BAD FAITH CONDUCT**

22

23  **1. Fraudulent Transfer of the Rapids Property to Ten Bears II, Inc.**

24

25  Using approximately $300,000 borrowed from Pete Hansen & Sons Partnership, 10 Bears

26  at Chiloquin, Inc. purchased the real property from Taylor and Lisa Day on May 17,

27

28

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

2004.  The next day, on May 18, 2004 Wayne Maynard and Stevens Kendall, purportedly on behalf of the debtor, transferred the real property to Ten Bears II, Inc.

-That transfer was made with no disclosure to PH&S to whom repeated representations in writing had been made that 10 Bears at Chiloquin, Inc. would, upon acquisition of the property, deed the property to PH&S.

-That transfer was made with no disclosure to PH&S who had a written agreement with the debtor that they would be deeded the real property.

-That transfer was made without the consent of Taylor and Lisa Day as required by the sale contract they had with 10 Bears.

-That transfer of all of the assets of 10 Bears was made without notice to the Chairman of the Board of 10 Bears, without notice to shareholders, without a properly noticed shareholders' resolution, without a properly noticed resolution of the Board of Directors and without any notice of dissenter's rights required under ORS 60.551 et. seq.

ORS 60.534 governs sale of assets other than in the regular course of business.  None of the notice requirements were met by 10 Bears at Chiloquin, Inc. in making the transfer to Ten Bears II, Inc. Moreover, the transfer of this asset by the debtor triggered Dissenters' Rights under ORS 60.551 to 60.594. None of those notice requirements were met.

**2. Preparation and circulation of a Private Placement Memorandum and Filing with the SEC of a Fraudulent Form SB-2**

The testimony of Wayne Maynard about the need for accuracy in a Form SB-2 filed with the SEC says it all. At his deposition he testified that in actuality Ten Bears II, Inc. had no shareholders.  He was shown the Form SB-2 and asked:

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

1   "Q. Okay.  Taking a look at that, do you know why it would appear that it is

2   stating that there are shareholders in Ten Bears II, Inc. when there were not

3   shareholders in Ten Bears II, Inc.?"

4

5   To which he responded in part:

6

7   "A. It was never determined by the SEC to be active.  It could not be used in order

8   to sell securities through brokers.  It wasn't approved by SEC.  That's number one.

9

10  Number two, anyone who is proposing SB-2, SB-1 registration statement and some

11  other proposals to the SEC can always amend, modify, or withdraw any statement

12  made in their documents up until its active.  **Furthermore, they can amend,**

13  **withdraw, even after its active if they're willing to repay any money that**

14  **somebody has spent on stock.**" [emphasis added]

15

16

17  The circulation of a Private Placement Memorandum and the filing with the Securities

18  and Exchange Commission of a Registration of Securities by a Small-Business Issuer

19  (Form SB-2) on behalf of Ten Bears II contained material misrepresentations and

20  omissions including but not limited to:

21      -The misrepresentation that the office building located at 325 A Street, Springfield,

22      was owned by a company associated with Ten Bears II when it was not.

23      -The misrepresentation that stock in Ten Bears II had been issued when it had not.

24      -The misrepresentation that there were no circumstances known to Wayne

25      Maynard, Stevens Kendall or Lori Allen which may give rise to any cause of

26      action which may imperil Ten Bears II, when they knew that:

27

28

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

1    -The real property transferred to Ten Bears II was the subject of an

2    agreement with Pete Hansen & Sons Partnership requiring the transfer of

3    that property to Pete Hansen & Sons Partnership.

4    -There had been no corporate resolutions, either by the board of directors or

5    shareholders of 10 Bears at Chiloquin, Inc., after notice to shareholders,

6    authorizing the transfer of the real property to Ten Bears II.

7    -There were creditors of 10 Bears at Chiloquin, Inc. which would have a

8    fraudulent conveyance claim against Ten Bears II for the transfer of the

9    property from 10 Bears at Chiloquin, Inc.

10   -Stock had not been transferred to the entities and persons listed and those

11   parties would have claims against Ten Bears II.

12   -Stock had been promised to others who were not disclosed and those

13   parties would have claims against Ten Bears II.

14   -Failure to disclose that Wayne Maynard had been convicted of bankruptcy fraud.

15   -Failure to disclose that the Fixed Base Operation for which Mr. Maynard had

16   been a CEO, had filed a chapter 11 while he was the CEO and the case was

17   converted to chapter 7.

18

19   **3.  Fraudulent intent transfer of the Rapids property to Rapids Properties,**

20   **Inc.**

21

22   In December, 2005 the debtor executed a warranty deed of the Rapids property from 10

23   Bears at Chiloquin, Inc. to Rapids Properties, Inc. That deed was recorded on January 10,

24   2006.

25   -That transfer was actively concealed from PH&S.

26   -That transfer was without the consent of Taylor and Lisa Day in breach of the

27

28

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

contract between them and 10 Bears at Chiloquin, Inc.

-That transfer was made in complete disregard of the earlier transfer of the

property to Ten Bears II and without any notice to the shareholders of Ten Bears

II.

-That transfer was made to a company which: (1). Had and continues to have no

shareholders; (2). Was and is controlled by the same persons who controlled the

debtor; (3). Which has and continues to obtain money from persons who are

promised an "investment" in the company.

ORS 60.534 governs sale of assets other than in the regular course of business.  None of

the notice requirements were met by 10 Bears at Chiloquin, Inc. in making the transfer to

Rapids Properties, Inc. Moreover, the transfer of this asset by the debtor triggered

Dissenters' Rights under ORS 60.551 to 60.594. None of those notice requirements were

met.

### 4.  Undisclosed loans to the shareholders of the debtor

Shareholders of the debtor borrowed more than one half million dollars of funds loaned to

the debtor by Pete Hansen & Sons for themselves.  These "loans" were taken on a weekly

basis with numerous "bonuses" paid to them.  When they were confronted by the IRS,

Wayne Maynard and Stevens Kendall entered into retroactive employment contracts with

the debtor.  When Stevens Kendall was asked when he was going to pay back the loans,

his testimony was that the obligations had been set off against the wages that were due

him under the retroactive employment contracts.  Stevens Kendall admitted in his

deposition that he had not declared any of the wage compensation on his income tax

returns.

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

The set off by Mr. Maynard and Mr. Kendall certainly triggers a taxable event. These manipulations have potentially created both a claim against the debtor by the Internal Revenue Service and claims of the debtor against Mr. Maynard, Mr. Kendall and Lori Allen.

## VIII. CONCLUSION

If this case had been commenced as a chapter 11 and the Court were considering a motion to convert the case to Chapter 7, more than ample cause, including bad faith considerations, exist for the conversion of the case to Chapter 7. The documents signed by the principals of the debtor seal that conclusion.

Mr. Maynard's testimony that his view of a Form SB-2 filed with the Securities Exchange Commission can contain any falsehood or material omission bodes poorly for the prospects of an accurate disclosure statement if this case is converted to chapter 11. His repeated promises to PH&S and the written agreement of the debtor with PH&S that upon acquisition of the Rapids property it would be deeded to the partnership, only to have the property immediately transferred to a shell corporation created by Mr. Maynard and operated by the directors and officers of the debtor, provide clear insight into the dim prospect that any provisions of a plan of reorganization would be honored.

The debtor's records cannot be counted upon to provide a clear picture of the debtor's prepetition activities. The same manipulation that occurred prepetition would certainly occur if the debtor were afforded debtor in possession status.

For years, the debtor shareholders received weekly distributions and bonuses designated

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon 97401
Phone: (541) 484-1216
Fax: (541) 484-5326

1   as "loans".  As soon as the IRS expressed its concern, Mr. Maynard and Mr. Kendall

2   promptly had the debtor execute retroactive employment contracts.

3

4   In order to avoid the impact of the debtor's records which reflect undisclosed loans made

5   pre-and postpetition to the debtor, Mr. Kendall and Mr. Maynard have testified under oath

6   that parties have "invested" funds in Rapids Properties, Inc.

7

8   Virtually any plan of reorganization to be proposed by the debtor is going to call for the

9   combining in some fashion of the debtor with Rapids Properties, Inc. That creates the

10  absolutely unacceptable situation where creditors of Rapids Properties, Inc. become

11  creditors of the debtor.

12

13  This debtor, and its principals, have played a shell game with Rapids Properties for years.

14  They entered this bankruptcy proceeding having transferred the Rapids property to a shell

15  corporation, which these same principals controlled, with no shareholders, in exchange

16  for a series of unsecured promissory notes and the agreement that Rapids Properties, Inc.

17  could further transfer the property.

18

19  Neither the debtor nor the principles made any attempt to unwind the transfer of Rapids

20  property prior to the filing of the bankruptcy.  Rather, they resisted the fraudulent

21  conveyance lawsuit filed in Lane County Circuit Court.

22

23  Certainly cause would exist for the conversion of this case to chapter 7.  There are no

24  unusual circumstances which would justify it being retained in a chapter 11.

25

26  There is no reasonable likelihood of an effective reorganization as neither Wayne

27

28

**Page 35 of 36**    HEARING MEMORANDUM

1  Maynard nor Stevens Kendall are about ready to relinquish control of the Rapids

2  property.  No fully informed investor is going to have anything to do with this project if

3  those two individuals have any control over it.  Under their control this property has

4  served only to separate misinformed individuals from their savings.  Placing the debtor in

5  the role of a debtor-in-possession affords Mr. Maynard and Mr. Kendall the opportunity

6  to surreptitiously obtain money from persons with the proclamation that as soon as the

7  case is out of chapter 11 they will realize a return on their investment.

8

9  The only prospect that creditors have a getting some of their claims paid is to allow the

10  Trustee to continue the avoidance action and market the property. The only hope that

11  parties will not be bilked by Mr. Maynard and Mr. Kendall using the Rapids property

12  requires that this case remain in Chapter 7.

13

14                              HAMMONS & MILLS

15

16  By: */s/ David B. Mills*
                  David B. Mills, OSB #77281
17                  Of Attorneys for Pete Hansen & Sons

18

19

20

21

22

23

24

25

26

27

28

**Hammons & Mills**
115 W. 8th Ave., #280
Eugene, Oregon  97401
Phone: (541) 484-1216
Fax: (541) 484-5326

*1n re 10 Bears at Chiloquin, Inc.*;
USBC Case No. 06-62079-fra7

<u>CERTIFICATE - TRUE COPY</u>

DATE:          **May 14, 2007**

DOCUMENT:          ***HEARING MEMORANDUM***

**Manual Notice List:**

I hereby certify that I prepared the attached copy of the foregoing named document and have carefully compared the same with the original thereof.  This copy is a true and correct copy of the whole original thereof.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served the true and correct copy as stated above on the following parties who are listed at the Court's website to receive manual noticing/service of documents in this case by mailing to them in a sealed envelope with postage pre-paid, addressed to each of them at their last known address, on the date listed above, and deposited with the US Postal Service at Eugene, Oregon:

| | | |
|---|---|---|
| Wayne W. Maynard | Lance Williamson | Andrew C. Brandsness, Esq. |
| 325 A St. | 1523 Willagillespie Rd. | 411 Pine Street |
| Springfield, OR 97477 | Eugene, Oregon 97401 | Klamath Falls, Oregon   97601 |
| | | |
| Stevens N. Kendall | Katharine G. Anderson | D and M Camelot LLC |
| 325 A St. | 89969 Greenwood Dr. | Attn: Linda Starner, Managing |
| Springfield, OR 97477 | Leaburg, Oregon 97489-9637 | Member |
| | | PO Box 295 |
| Lori M. Allen | | Dexter, OR 97431 |
| 325 A St. | | |
| Springfield, OR 97477 | | |

**Electronic Mail Notice List:**

The following parties are currently listed at the Court's website to receive service electronically by the Court for this case:

- US Trustee - Eugene
- Thomas A. Huntsberger
- David B. Mills
- Douglas R. Schultz
- Kent Anderson
- Judson M. Carusone
- Gilbert B. Weisman

HAMMONS & MILLS

By: */s/ David B. Mills*
    David B. Mills, OSB # 77281
    Of Attorneys for Pete Hansen & Sons