UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re: | ) Bankruptcy Case |
| | ) No. 06-62079-fra7 |
| 10 BEARS AT CHILOQUIN, INC., | ) |
| | ) MEMORANDUM OPINION |
| Debtor. | ) |

The Debtor ("10 Bears") in this Chapter 7 case seeks to convert the case to one under Chapter 11. 11 U.S.C. § 706. The Debtor's principal creditor objects. The Court finds that the case should not be converted, and it should remain in Chapter 7.

I. BACKGROUND

1. Procedural Posture

This case was commenced under Chapter 7 of the Bankruptcy Code[1] on October 13, 2006. After actions in State Court seeking to recover alleged fraudulent transfers were removed to this Court, Debtor moved, on March 27, 2007, to convert the case to one under Chapter 11 of the Code, pursuant to Code § 706. Pete Hansen & Sons, a partnership ("Hansens"), objected, relying on a recent decision of the United States Supreme

---

[1] 11 U.S.C. §§ 101-1532.

Page 1 - MEMORANDUM OPINION

Court, <u>Marrama v. Citizens Bank of Massachusetts</u>, 127 S.Ct. 1105, 75 USLW 4113 (2007). The motion and objections were considered in a three-day hearing ending on May 18, 2007.

2. <u>History</u>

10 Bears entered into an agreement with Hansens whereby Hansens would loan money, which it had itself borrowed, to 10 Bears. 10 Bears would in turn use the funds to acquire property, including acreage, a small motel and a restaurant, on Highway 97 near Chiloquin. Hansens' borrowings were secured by timber wholly owned by Hansens. While Hansens may have expected to acquire an interest in the Chiloquin property to secure repayment, that, as will be seen, never occurred.

Efforts to acquire the Chiloquin property from Lisa and Taylor Day ("Days") floundered, and litigation ensued. The Days and 10 Bears settled prior to trial with an agreement providing for the sale by Days to 10 Bears. Payment to the Days was secured by a deed of trust.

As noted, 10 Bears had borrowed a substantial amount of money – at least $2 million, according to the Debtor's schedules – to finance acquisition of the property and "operations." While some of the funds may have been used to make the down payment to Days, 10 Bears ultimately failed to pay the balance to Days when it came due, and the Days have initiated proceedings to reclaim the property. This does not mean that the remaining borrowed funds were idle: 10 Bears had made unsecured loans of over $500,000 to insiders. When advised by the Internal Revenue Service that the practice was inappropriate, 10 Bears' directors promulgated resolutions purporting to employ the insider borrowers,
// // //

Page 2 - MEMORANDUM OPINION

committing the corporation to pay compensation in amounts equal to or slightly exceeding the amounts borrowed.

In the meantime, 10 Bears was searching for additional funding, ostensibly to finance its development of the Chiloquin property. It initiated the legal procedures required for a public stock offering. To facilitate this process, 10 Bears' shareholders created a new corporation, Rapids Properties, Inc. The rationale was, evidently, that a new, "clean" company would be better situated to raise the funds from new shareholders to proceed with the purchase and development of the property. On or about January 2, 2006, 10 Bears conveyed the Chiloquin property to Rapids Properties for $3,800,000, a substantial gain – on paper at least – over the $1,575,000 million purchase price from Days. The terms of the sale did not involve any cash: Rapids Properties was to assume the obligation to Days, and provide 10 Bears with a promissory note in the sum of $2.7 million. The note is unsecured "except for a security agreement for all real and personal property that binds [10 Bears] resulting from its purchase of the property from Taylor and Lisa Day." (See Exhibit MM.)

Upon learning of the transfer by 10 Bears to Rapids Properties, Hansens commenced an action in the Circuit Court for Lane County, Oregon, seeking to avoid the transfer as fraudulent. Before the matter could come on for trial, the Debtor filed its petition for relief in this Court. Debtor's schedules show assets of $6,029,720, consisting of the promissory notes from Rapids Properties, notes from insiders Kendall and Maynard, and unliquidated legal claims against Hansens and the attorney who undertook to prepare the public offering.

Page 3 -   MEMORANDUM OPINION

## II. ISSUES

1. Have the creditors shown that cause exists to deny the Debtor the opportunity to reorganize under Chapter 11 of the Bankruptcy Code? If so,

2. Has the Debtor demonstrated an ability to propose and confirm a plan of reorganization, even if cause to deny reorganization might exist?

## III. LEGAL ISSUES

1. <u>Marrama</u>

In <u>Marrama v. Citizens Bank of Massachusetts</u>, the debtor made a pre-petition transfer, without consideration, to a newly created trust. Seven months later he filed his petition in bankruptcy, making no mention of the transfer in this schedules and scheduling his interest in the trust as valueless. These circumstances were uncovered by the trustee at, or perhaps before, the meeting of creditors. At the meeting, the trustee advised debtor that he intended to recover the vacation property as an asset of the estate. Thereafter, the debtor filed a "notice" that the case was to be converted to Chapter 13. The trustee objected, and the Bankruptcy Court sustained the objection, refusing to permit the conversion. The Court of Appeals for the First Circuit and the Supreme Court subsequently affirmed.

The Supreme Court held that a party is effectively ineligible to reorganize under Chapter 13 if circumstances exist constituting cause under Code § 1307(c) to either dismiss a pending Chapter 13 case, or convert such case to one under Chapter 7.

> In practical effect, a ruling that an individual's Chapter 13 case should be dismissed or converted to Chapter 7 because of pre-petition bad faith conduct, including fraudulent acts

Page 4 - MEMORANDUM OPINION

>     committed in an earlier Chapter 7 proceeding, is tantamount to
>     a ruling that the individual does not qualify as a debtor under
>     Chapter 13.

Marrama, 127 S.Ct. At 1111.

The Court went on to note that the broad power to prevent abuse granted to Bankruptcy Courts by Code § 105(a) is "surely adequate to authorize an immediate denial of a motion to convert filed under § 706 in lieu of a conversion order that merely postpones the allowance of equivalent relief. . . ." Id. at 1112.

In short, the central holding of Marrama is that circumstances justifying conversion or dismissal of a Chapter 13 case authorize the Bankruptcy Court to prohibit conversion of a liquidation proceeding to one under Chapter 13. The statutory language of Code §§ 1307 and 1112, the equivalent Chapter 11 provision, are substantially equivalent. It follows that the Marrama rule is applicable with respect to Chapter 11 reorganization as well.

## IV.  CODE § 1112

Code § 1112 governs conversion or dismissal of Chapter 11 cases, and was substantially rewritten by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). Drafted in the rococesque style typical of BAPCPA, the section governs conversion or dismissal of Chapter 11 cases as follows:

1. A case may be dismissed or converted for cause. "Cause" is not explicitly defined, but is said to include any of a long list of events or circumstances. Most involve some form of conduct respecting the case or mismanagement of the estate. While these specified acts are calm by their nature, post-petition it has long been held that Courts may take

Page 5 - MEMORANDUM OPINION

pre-petition conduct into account. Marrama at 1111. ("Bankruptcy courts nevertheless routinely treat dismissal for pre-petition bad faith conduct as implicitly authorized by the words "for cause.") It is generally recognized that "good faith" is a threshold prerequisite to securing Chapter 11 relief: Matter of Madison Hotel Associates, 749 F.2d 410, 426 (7th Cir. 1984); In re BBT, 11 B.R. 224, 235 (Bankr. D.Nev. 1981); In re Victory Constr. Co., 9 B.R. 549, 558 (Bankr. C.D. Cal. 1981), and that the lack of such good faith constitutes "cause," sufficient for dismissal under 11 U.S.C. § 1112(b). In re Marsch, 36 F.3d 825, 828 (9th Cir. 1994).

The existence of good faith in this context depends on "an amalgam of factors," as opposed to a single fact. Marsch at 828; In re Arnold, 806 F.2d 937, 939 (9th Cir. 1986). The test, as stated in Arnold, is "whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis."

    2. Notwithstanding the existence of cause, the Court shall not convert or dismiss a case if there are "unusual circumstances specifically identified by the court" establishing that conversion or dismissal would not be in the best interest of creditors and the estate. In predicate of such a finding is demonstration by the debtor or another party in interest that (a) there is a reasonable likelihood that a plan would be confirmed and (b) that the cause for conversion or dismissal included an act or omission which was reasonably justified and which would be cured within "a reasonable period of time fixed by the court." Code § 1112(b)(1) and (2).

Page 6 - MEMORANDUM OPINION

In other words, demonstration that past faults were innocent and curable and that a plan can be confirmed to the ultimate benefit of creditors and the estate is an affirmative defense to a claim that the case should be converted or dismissed.

V. DISCUSSION

1. <u>Cause Exists to Deny Conversion</u>

<u>Marrama</u> establishes that the Court may deny a motion to convert to Chapter 11 if objecting creditors establish "cause" as described by § 1112(b)(4). Cause includes gross mismanagement of the estate, and gross mismanagement of the debtor's affairs pre-petition. The Court finds that the following circumstances constitute cause to deny the Debtor's late efforts to proceed under Chapter 11:

The Debtor made improper loans to insiders who do not appear to have the means or the inclination to repay the loans. This misconduct was compounded by transparent efforts to justify these transfers by creating, after the fact, employment contracts between the Debtor and the recipients of the so-called loans. There is nothing in the record to suggest that two of the recipients, Mr. Stagg and Mr. Kendall, performed any services for the Debtor to justify compensation in the amounts contemplated. Whether the third recipient, Mr. Maynard, provided services of equivalent value is, at best, problematic.

If an employment relationship did exist between the Debtor and Mr. Maynard and the others, no steps were taken to provide for tax withholding and other required payments. The result may be a substantial liability.

// // //

Page 7 - MEMORANDUM OPINION

The Debtor has failed to file current tax returns, and account for compensation paid.

The Debtor has failed to maintain the debt service on its only asset, the Chiloquin property. If there is any justification for failure to pay the amounts due to the Days, particularly in light of the sums borrowed from Hansens, it does not appear on this record.

The transfer by the Debtor to Rapids Properties was fraudulent in two respects: First, it appears to have been intended to put the property beyond the reach of creditors such as the Hansens. Second, it appears that the Debtor's management intended to market shares in the second company in a manner designed to disguise the substantial debt owed to the Days and the Hansens.

The Debtor's schedules failed to disclose a number of unpaid loans, including $275,000 to Herb and Lenore Person.

The sale by 10 Bears to Rapids Properties purports to yield a very substantial capital gain. However, the sale is structured in a manner that yields to the Debtor no cash with which to pay the inevitable tax. Assuming for the sake of argument that the sale cannot be set aside, the Debtor has saddled itself with a potentially ruinous tax burden for no discernable purpose. Moreover, the debt is unsecured, constituting an unreasonable risk to 10 Bears' creditors.

Finally, it is significant that this case was filed by the Debtor under chapter 7 shortly before the Hansens' state court proceeding was to be tried. After the case was removed, the Debtor sought to have it remanded. The Debtor did not seek to reorganize until after this court declined to do so, and authorized Hansens to prosecute the matter for the

Page 8 - MEMORANDUM OPINION

benefit of the estate. The effect, of course, of a conversion would be to stop the avoidance action. This adds to the "amalgam" of bad faith making conversion inappropriate.

2. <u>Reorganization Is Not Likely</u>

In support of its position, the Debtor advances only a vague proposal to "substantively consolidate" 10 Bears and Rapids Properties. The approach is not feasible. Rapids Properties is not a functioning corporation, and presently exists without shareholders or officers. Its only asset is legal title to the Chiloquin property. Moreover, it may well be that Rapids Properties has its own creditors, which would render consolidation impracticable, if not inequitable.

Assuming that the case can go forward with all the assets under one roof, the Debtor's management does not present any reasonable likelihood that it can successfully reorganize. While plans have been drawn up for the extensive renovation and improvement of the subject property, the Debtor's only proposed method of payment appears to involve either more borrowing, or a stock offering. The Debtor's record to date provides no reason to believe that any such efforts would succeed. Moreover, the record does not reflect that the Debtor has given due consideration to such issues as tax liabilities, payment for professional costs, land use planning, or a host of other issues.

Finally, it must be observed that the Debtor has not acted with good faith towards its creditors, and cannot be expected to do so in the future. Debtor's dealings with the Hansens have, in particular, shown an utter disregard for the Hansens' interests. While maneuvering the property to ensure that it not be available to pay the debt to the

Page 9 - MEMORANDUM OPINION

Hansens, the Debtor nevertheless enticed the Hansen partnership into putting up its own property to secure the original borrowing. That property has since been lost to the Hansens' creditors, and the Hansens have nothing to show for it. While it may well be said that the Hansens might have been more careful in their dealings, this does not excuse the damage done to them by the Debtor's sharp practices. Any effort to reorganize requires a debtor to protect the interest of creditors and the estate, as well as its own. The debtor here has demonstrated that it is incapable of doing so.

## VI. CONCLUSION

The Debtor has engaged in a pattern of bad faith and mismanagement which has caused considerable loss to its creditors. These circumstances provide ample justification for refusal, under <u>Marrama</u> and Code § 1112, to allow this case to proceed under Chapter 11 of the Bankruptcy Code. For that reason, an order will be entered denying the Debtor's motion to convert the case to one under Chapter 11.

This opinion constitutes the Court's findings of fact and conclusions of law. An order consistent herewith will be entered by the Court.

FRANK R. ALLEY, III
Bankruptcy Judge